UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

CHRIS S. PINEGAR                    )
                                    )
            Plaintiff,              )
                                    )
      vs.                           )        Case No. 4:10-CV-643 (CEJ)
                                    )
MICHAEL J. ASTRUE, Commissioner     )
of Social Security,                 )
                                    )
            Defendant.              )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.  Procedural History

On May 22, 2006, plaintiff Chris S. Pinegar filed applications for disability insurance benefits (DIB) under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and for supplemental security income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381 *et seq.*, with an alleged onset date of June 8, 2005.  (Tr. 70-75, 76-80).  After his applications were denied on initial consideration (Tr. 43-47), plaintiff requested a hearing from an Administrative Law Judge (ALJ).  (Tr. 51).

The hearing was held on August 6, 2008.  (Tr. 22-39).  Plaintiff was represented by counsel.  The ALJ issued a decision denying plaintiff's claims on August 26, 2008.  (Tr. 8-21).  The Appeals Council denied plaintiff's request for review on February 19, 2010.  (Tr. 1-3).  Accordingly, the ALJ's decision stands as the Commissioner's final decision.  See 42 U.S.C. § 405(g).

## II.  Evidence Before the ALJ

At the time of the hearing, plaintiff was 38 years old. (Tr. 25). He graduated from college in 2000 with a degree in education. He testified that Vocational Rehabilitation had paid a part of his tuition with the intention that he would become a teacher. (Tr. 28-29). After graduation, he took the teacher certification examination, but he failed and has been unable to obtain certification. (Tr. 29). Plaintiff testified that his parents provided him with the cabin in which he was living and provided for his other financial needs. (Tr. 34).

Plaintiff testified that he suffers from rheumatoid arthritis, which affects his ankles, knees, elbows, hands and wrists. (Tr. 31). He experiences pain that he described as sharp or stabbing. (Tr. 32). His fingers swell during flares, making it impossible for him to hold a pencil, close his hand into a fist, or use a keyboard. (Tr. 34). His knees "swell up great big." (Tr. 28). On average, he experiences severe pain two to three days a week. On those days, he spends nearly the whole day in his recliner, watching television. (Tr. 33). On a good day, he can lift 20 pounds without pain; on a bad day, he cannot lift more than 5 pounds. (Tr. 34). He is unable to tolerate Plaquenil[1], and he takes Vicodin[2] and Tylenol for his pain. (Tr. 33). His last x-ray, MRI, or CT scan was taken when he was 20 years old. (Tr. 28).

Plaintiff worked as a clerk at a convenience store after high school. (Tr. 25). Thereafter, he held jobs as a parts clerk, a truck dispatcher, a forklift operator, a

---

[1]Plaquenil, or Hydroxychloroquine, is an antimalarial also used to treat discoid or systemic lupus erythematosus and rheumatoid arthritis in patients whose symptoms have not improved with other treatments. http://www.nlm.nih.gov/medlineplus/drug info/meds/a601240.html (last visited on June 28, 2011).

[2]Vicodin is a narcotic analgesic indicated for relief of moderate to moderately severe pain. Dependence or tolerance may occur. See Phys. Desk. Ref. 530-31 (60th ed. 2006).

scorer for a university, and a payroll clerk. (Tr. 25-26, 35). His most recent period of employment was in 2004 and 2005 when he worked installing insulation. (Tr. 27). He testified that his inability to sit for any length of time prevented him from returning to his prior work as a scorer or dispatcher. (Tr. 27). He cannot work as a substitute teacher because he cannot stand. (Tr. 29).

Jeffrey F. Magrowski, Ph.D., a vocational expert (VE), was questioned about the employment opportunities for an individual who was 35 years old, had 16 years of education, with plaintiff's past work experience, who is limited to lifting and carrying up to 20 pounds occasionally and 10 pounds frequently, with occasional climbing, stooping, kneeling, and crouching, and requires a sit-stand option. (Tr. 35-36). The VE was also asked to assume that the individual should avoid concentrated exposure to extreme cold, vibration and unprotected heights. Dr. Magrowski opined that such an individual could not return to his past relevant work but could perform other light unskilled work, such as information clerk, parking lot attendant or cashier. (Tr. 36). The ALJ next asked the VE to assume that the individual was limited to occasionally lifting 10 pounds and frequently lifting less than 10 pounds, with no more than two hours of standing and walking, and no sit-stand option. (Tr. 36-37). The VE opined that an individual with these limitations could perform sedentary semi-skilled work, such as sedentary cashier or dispatcher, though not as plaintiff previously performed the job. Finally, the VE was asked to assume the individual had restrictions consistent with those in the Medical Source Statement (Tr. 182-84): lifting no more than 10 pounds, standing or walking no more than 3 hours, and sitting for a total of 4 hours or continuously for 20 minutes; limited pushing and pulling; no climbing, balancing, stooping, kneeling, crouching, and occasional bending; and limited handling or

-3-

fingering. (Tr. 183). In response, the VE stated that he knew of no jobs available for such an individual. (Tr. 38). In response to counsel's question whether work existed for an individual who has to spend 2 or 3 days each week in a recliner, the VE testified that no substantial gainful work activity could be performed. Id.

The record contains a Disability Report completed by plaintiff. (Tr. 94-102). He listed rheumatoid arthritis and flat feet as his disabling conditions. These conditions limit his ability to stand for any length of time. He also has trouble getting around, bending over, and lifting. He cannot close his hands to make a fist. (Tr. 95). Elsewhere, he noted that standing causes his knees to swell to 4 or 5 times their normal size and sitting causes back pain. (Tr. 104). Plaintiff stated that his conditions affect his abilities to lift, squat, bend, stand, reach, walk, sit, kneel, and climb stairs. He can walk about 20 yards before he needs to rest for about 10 minutes. (Tr. 116). He periodically had fluid removed from his knees and received cortisone injections in his knees and back. (Tr. 104).

Plaintiff has worked as a substitute teacher, a payroll clerk, a truck dispatcher, forklift operator, a scorer, a lobster farmer, and an insulation installer. (Tr. 96, 103). Plaintiff's longest-held job was as a scorer, which consisted of data entry for 8 hours a day. (Tr. 96). Plaintiff's medications included Advil, Prevacid,[3] and Prilosec.[4] (Tr. 100).

---

[3]Prevacid is prescribed for the treatment of duodenal ulcer, gastric ulcer, gastroesophageal reflux disease, erosive esophagitis and pathological hypersecretory conditions. See Phys. Desk Ref. 3274 (61st ed. 2007).

[4]Prilosec, or Omeprazole, is used alone or with other medications to treat ulcers, gastroesophageal reflux disease (GERD), and erosive esophagitis. http://www.nlm.nih.gov/medlineplus/druginfo/meds/a693050.html (last visited on May 25, 2010).

Plaintiff completed a Function Report. (Tr. 111-18). He wrote that he is extremely sore or stiff in the mornings. Depending on the weather, it may take most of the day for his joints to bend. (Tr. 111). Rolling over in his sleep causes pain which wakes him. (Tr. 112). He has to lean on something in order to get dressed and finds it difficult to bend over to put on his shoes. (Tr. 112). He prepares his own meals and can do household chores so long as he is not on his feet for too long. His father sometimes helped with yard work. (Tr. 113). He was able to use a checkbook, pay bills, handle a savings account, and count change. He did not have a driver's license. (Tr. 114).

Plaintiff identified his hobbies as fishing, watching television, reading and barbecuing. (Tr. 115). He spends time with his parents and a friend and has no difficulty getting along with others. (Tr. 115-16). He described his ability to follow written and spoken instructions as "fine."

### III. Medical Evidence

Plaintiff had an initial appointment with Sharon Carmignani, M.D., on June 13, 2006.[5] (Tr. 158-59). He reported that he was having difficulty with panic attacks. He had first experienced panic attacks 8 or 10 years earlier in response to work-related stress. He was successfully treated with Alprazolam[6] and had a long period of time without any panic attacks. However, he had recently experienced a number of stressful events in a short period of time: he totaled his car in an accident, he was laid off from his job grading SATs, and his father had entered the hospital. (Tr. 158).

---

[5]Plaintiff submitted his disability applications on May 22, 2006.

[6]Alprazolam belongs to the class of medications known as benzodiazepines and is used to treat anxiety and panic disorders. http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a684001.html (last visited on June 28, 2011).

Plaintiff stated that he had been diagnosed with rheumatoid arthritis when he was 17. He had not seen a rheumatologist since losing his insurance about 10 years earlier. He described having nodules[7] that appeared at different sites. He had been treating the condition with aspirin, Motrin or prednisone. Plaintiff also reported that he had dyspepsia and reflux, which he treated with limited success with over-the-counter medications. On physical examination, plaintiff had no edema; his gait and station were normal, and his pulses were full. His neurological examination was unremarkable. Dr. Carmignani prescribed Alprazolam, to be taken as needed to control panic attacks, and Ranitidine[8] for treatment of reflux.

Plaintiff returned for a follow-up visit on July 25, 2006. (Tr. 160). He told Dr. Carmignani that he had applied for disability. He reported that his panic was well-controlled with one tablet of Aprazolam three times a day and two tablets at bedtime. Dr. Carmignani reviewed blood tests[9] indicating that plaintiff was HLA-B25[10] positive, seronegative,[11] ANA negative,[12] and had a normal sedimentation rate.[13] Plaintiff

---

[7]Rheumatoid nodules are subcutaneous nodules occurring most commonly over bony prominences in some patients with rheumatoid arthritis. Stedman's Med. Dict. 1223 (27th ed. 2000).

[8]Ranitidine is indicated in treatment of duodenal ulcer, GERD, and erosive esophagitis. See Phys. Desk. Ref. 1633-35 (65th ed. 2011).

[9]The laboratory report from which these results were taken does not appear in the medical record.

[10]HLA, which stands for "human leukocyte antigen," is the designation for different gene products associated with certain diseases. See Stedman's Med. Dict. 100-01 (27th ed. 2000).

[11]"Seronegative" refers to those spondyloarthropathies in which the rheumatoid factor is negative. These include ankylosing spondylitis, reactive arthritis, and psoriatic arthritis. The Merck Manual of Diagnosis and Therapy 290-91 (18th ed. 2006).

[12]The ANA, or antinuclear antibody panel, tests for the presence of substances produced by the immune system that attack the body's own tissues.

complained of joint pain, especially in his knees and lower back, and he had difficulty getting on and off the examination table. Physical examination disclosed some tenderness of the joints on palpation but there was no fluid in the knees, erythema or swelling. Dr. Carmignani renewed plaintiff's medications. She also noted that she would support plaintiff's application for disability "because he is not capable of doing manual labor." Blood tests completed on July 25, 2006 indicate a sedimentation rate of 17, an RA factor[14] of 2.7, and a negative ANA test. (Tr. 145-46, 148).

An examining consultant completed a Physical Residual Functioning Capacity Assessment on August 31, 2006. (Tr. 147-52). The consultant determined that plaintiff can occasionally carry 10 pounds and frequently carry less than 10 pounds. He can sit for about 6 hours and stand for about 2 hours in an 8-hour day. In support of these limitations, the consultant cited the recent blood tests and the results of Dr. Carmignani's physical examinations in June and July 2006. The consultant noted that the suggested restrictions were "to help prevent future injuries. Nevertheless, his condition should improve if he starts taking a remitting agent such as Plaquenil." Id. The consultant also noted that Dr. Carmignani had concluded that plaintiff was

---

http://www.nlm.nih.gov/medlineplus/ency/article/003535.htm (last visited on June 23, 2011).

[13]Sedimentation rate, or "sed rate," is a measure of the distance red blood cells fall in an hour and is a test for the presence of inflammatory activity, which can cause cells to clump together, increasing the speed with which the cells fall. Greater distances indicate greater inflammatory response. http://www.mayoclinic.com/health/sed-rate/MY00343 (last visited June 28, 2011). The normal ranges for men are 0-22 mm/hr and for women 0-29 mm/hr. http://www.mayoclinic.com/health/sed-rate/MY00343/DSECTION=results (last visited June 28, 2011).

[14]"Rheumatoid factor" refers to antibodies produced in rheumatoid arthritis and other autoimmune disorders. See The Merck Manual of Diagnosis and Therapy 283-84 (18th ed. 2006).

incapable of manual labor. That conclusion was not given controlling weight as it was unsupported by medical evidence in the record. (Tr. 152).

Plaintiff returned to see Dr. Carmignani on September 21, 2006. (Tr. 161). Plaintiff complained of pain in his knees and nonradiating low back pain that was worse with standing or sitting. Past cortisone shots in his back had not provided relief. Dr. Carmignani noted that plaintiff had some tenderness to palpation of the lumbosacral area; his knees were not tender and had no fluid; and he had good grip strength. She detected no palpable synovitis[15] of his joints. She attributed plaintiff's back pain to mechanical low-back strain unrelated to arthritis. Plaintiff's panic disorder was well-controlled by the Alprazolam. She directed him to continue to take Ibuprofen and Ranitidine and added Plaquenil for treatment of rheumatoid arthritis.

Plaintiff returned to see Dr. Carmignani as scheduled on October 24, 2006. (Tr. 162). He stated that the Plaquenil caused stomach pain and diarrhea. He complained of pain in his knees, low back, and left shoulder, and muscle spasms under his ribs. He reported that he had gained about 20 pounds and that he had been walking for exercise, but the walking caused knee pain. He treated the joint pain with Ibuprofen and took Zantac for his stomach discomfort. He reported that the dosage of Alprazolam was not adequate to control the panic disorder. On physical examination, plaintiff had normal ranges of motion of his knees and no tenderness on palpation. However, he had trouble transitioning from sitting to standing and bearing weight and his back was markedly tender. Dr. Carmignani discontinued the Plaquenil, increased

---

[15]Synovitis is an inflammation of a synovial membrane, especially that of a joint. Stedman's Med. Dict. 1773 (27th ed. 2000).

his Alprazolam to 1 milligram 4 times a day, and prescribed Vicodin for treatment of arthritis pain and Soma for muscle spasms.

Plaintiff returned on December 26, 2006. (Tr. 163). Dr. Carmignani noted that plaintiff was positive for antigens associated with rheumatoid arthritis and had a positive rheumatoid arthritis titer (RA titer) with slightly elevated sedimentation rate. She did not identify the date on which these results were obtained and the record does not contain a laboratory report in which these results appear.[16] Plaintiff reported that he was having problems with his knees, wrists, the small joints of his hands, left elbow and left little toe. He wanted to delay x-rays until he had insurance. His panic attacks were controlled with the increased dosage of Alprazolam, but he requested additional Vicodin for pain relief.

On February 20, 2007, in response to interrogatories, Dr. Carmignani diagnosed plaintiff with rheumatoid arthritis, panic attacks, and gastroesophageal reflux disease. (Tr. 154-56). As support for the diagnoses, she cited plaintiff's RA titer of 15 (normal 14), sedimentation rate of 17 (normal 15), and positive HLA-B27 test.[17] She noted that plaintiff was not being treated with any RA-specific medication and that frequent flare-ups were possible. She was not asked whether plaintiff had any restrictions on his ability to work and did not offer an opinion on that matter.

---

[16]A lab report dated October 24, 2006 indicates a normal result on a test for thyroid-stimulating hormone. (Tr. 169). The next lab report is dated April 3, 2007, and appears to show elevated results for sedimentation rate, but the copy contained in the court record is illegible. (Tr. 170).

[17]HLA-B27 is a blood test for human leukocyte antigen B27. A positive test is associated with a greater risk of developing ankylosing spondylitis, Reiter syndrome, and sacroiliitis. http://www.nlm.nih.gov/medlineplus/ency/article /003551.htm (last visited June 23, 2011).

On April 3, 2007, plaintiff reported to Dr. Carmignani that he was experiencing more pain with the change in the weather. (Tr. 165). His left knee had been swollen but was better at the moment. Similarly, he reported that his hands were very stiff on occasion. There was no swelling apparent on examination, but he had some difficulty making fists. He also reported nonradiating low-back pain. He had lost 7 pounds since his last visit. Dr. Carmignani renewed his prescriptions and ordered blood tests.

Plaintiff had an office visit on June 5, 2007. (Tr. 172). Dr. Carmignani noted that he had a slightly elevated sedimentation rate of 27 with a rheumatoid factor of 21. He reported that he was experiencing pain and stiffness in his right knee, right thumb, and right hand. He was unable to make a fist and had diminished grip strength in that hand. Dr. Carmignani noted tenderness on palpation of the lumbosacral area and the right hand. Plaintiff had decreased range of motion of the right knee and Dr. Carmignani noted some tenderness and fullness consistent with effusion. Dr. Carmignani prescribed another trial of Plaquenil and instructed plaintiff to take the medication with food. She renewed his prescriptions for Vicodin, Alprazolam and Soma.

On August 7, 2007, plaintiff reported that his panic disorder was well-controlled by Alprazolam. (Tr. 173). He experienced flare-ups in his knees from time to time and had morning stiffness. He discontinued the Plaquenil after 6 weeks due to diarrhea. He demonstrated no tenderness to palpation and had good ranges of motion at the shoulders and knees. Dr. Carmignani detected no fluid at the knees. Plaintiff was directed to take two 800 milligram Ibuprofen three times a day, and Vicodin up to three times a day, and to continue with the Alprazolam and Soma.

Plaintiff returned on November 1, 2007. (Tr. 181). He reported experiencing pain and stiffness in several joints, but no swelling. He also complained of pain up and down his spine. He felt pain upon making fists, but demonstrated good grip strength in both hands. He had normal ranges of motion at his wrists and knees and no tenderness to palpation. Dr. Carmignani did not observe any obvious synovitis. Dr. Carmignani opined that plaintiff has rheumatoid arthritis, based on his childhood history, blood tests, and "typical hand and knee distribution." She urged plaintiff to get x-rays and see a rheumatologist, but he stated that he preferred to wait until he received a decision on his application for disability.

Plaintiff returned on February 5, 2008. (Tr. 180). He reported that he was taking the Soma only sporadically as he no longer found it helpful to treat his back pain. He continued to experience morning stiffness, pain, and occasional swelling. He was stiff getting off the examining table and displayed some stiffness with bilateral grips of his hands. His physical examination disclosed no effusion or swelling. Dr. Carmignani discontinued the Soma and prescribed Flexeril[18] in its place. He declined x-rays yet again.

On May 6, 2008, plaintiff reported that he had stepped on a nail. (Tr. 179). He went to the emergency room where he received a tetanus shot. He was experiencing some swelling and pain at the wound site. He reported more difficulty with joint pain, with swelling in his ankles and hands. Dr. Carmignani urged him to accept a referral to a specialist; he agreed that he would investigate whether he could receive financial assistance to see a specialist. Dr. Carmignani prescribed an antibiotic to treat the

---

[18]Flexeril is indicated as an adjunct to rest and physical therapy for relief of muscle spasm associated with acute musculoskeletal conditions. See Phys. Desk Ref. 1832-33 (60th ed. 2006).

possible infection in his foot and scheduled plaintiff to return in one week for followup. An x-ray of plaintiff's right hand was unremarkable. With respect to the left hand, there was no evidence of periarticular erosive changes or juxtaarticular osteopenia.[19] There were possible minimal degenerative changes of one joint in the left hand. (Tr. 175-76).

Plaintiff saw Dr. Carmignani on May 13, 2008. (Tr. 178). He reported that he was experiencing pain and stiffness in his hands, knees, and wrists. He experienced pain and swelling in his knees if he stood for long periods of time. His sedimentation rate had risen to 43, but his RA titer was low. Dr. Carmignani again urged him to see a rheumatologist. On examination, plaintiff had good hand grip bilaterally and normal range of motion at the knees. There was no tenderness to palpation.

Dr. Carmignani completed a medical source statement on August 5, 2008. (Tr. 182-84). She indicated that plaintiff retained the capacity to frequently lift 10 pounds and to occasionally lift 10 pounds. He could stand or walk for a total of 3 hours and sit for a total of 4 hours and continuously for 20 minutes. She indicated that he had a limited ability to push or pull but failed to describe the degree of limitation. Dr. Carmignani stated that plaintiff could never climb, balance, stoop, kneel or crouch and could occasionally bend. She also indicated that plaintiff's abilities to handle and finger were limited as a result of swelling, stiffness, and pain in the small joints of his hands. She did not identify any environmental restrictions. In response to a question regarding the clinical findings that supported the restrictions, Dr. Carmignani identified plaintiff's elevated sedimentation rate and RA titer. Dr. Carmignani indicated that

_____

[19]Decreased calcification or density of bone. Stedman's Med. Dict. 1284 (27th ed. 2000).

plaintiff's pain would be helped by rest but that reclining or elevating his feet would not provide relief.

After the ALJ denied his applications, plaintiff underwent an assessment at the University of Missouri Rheumatology Clinic. (Tr. 205-45). On December 1, 2008, Fernando X. Castro, M.D., ordered x-rays, blood work, and a gastro-intestinal consultation. (Tr. 205-08). On December 3, 2008, Dr. Castro noted that the blood tests were unremarkable, although plaintiff's sedimentation rate was elevated. On December 4, 2008, Dr. Chokkalingam Siva reviewed the record and wrote: "I doubt if this [patient] has an ongoing inflammatory process." (Tr. 207). On January 9, 2009, Dr. Castro noted that the x-rays were "essentially unremarkable" with the exception of bilateral fusion and sclerosis of the sacroiliac joint. Id.

Dr. Carmignani provided responses to additional interrogatories on January 9, 2009. (Tr. 132-36). She indicated that a complete evaluation by a rheumatologist could cost $500 plus the cost of x-rays. She opined that plaintiff was limited to sedentary work due to polyarticular arthritis. As support for her assessment, she cited plaintiff's elevated sedimentation rate of 43 in May 2008, and RA factor of 21 in April 2007.

Plaintiff returned to the Rheumatology Clinic on January 13, 2009. He reported intermittent swelling and pain in his hands and complained of constant fatigue and weakness. (Tr. 209). Dr. Castro noted that plaintiff had "prominent inflammatory back pain," a condition "not usually associated with [rheumatoid arthritis]. (Tr. 212). In addition, plaintiff had a "strong family history of" inflammatory bowel disease and

-13-

intermittent gastrointestinal bleeding, indicative of possible enteropathic arthropathy.[20] Id. Plaintiff was urged to stop taking Vicodin and Ibuprofen and to stop using alcohol. (Tr. 213). Dr. Castro started plaintiff on Tramadol[21] and Methotrexate.[22]

At a follow-up visit with Dr. Castro on March 11, 2009, plaintiff reported ongoing pain, swelling and warmth in his hands and knees. (Tr. 215). Despite Dr. Castro's recommendation, plaintiff continued to take Vicodin and Ibuprofen and had not yet started taking the Methotrexate. He stated that the Tramadol provided relief. Dr. Castro found that plaintiff's only symptom consistent with rheumatoid arthritis was joint stiffness in the morning. He had a cough that had not responded to antibiotics. On examination, Dr. Castro found no evidence of synovitis, swelling, tenderness, or effusion. Plaintiff had a full range of motion and normal muscle strength. An MRI of the pelvis indicated some edema in the pubic bone. (Tr. 218). It was also noted that plaintiff had a relatively symmetric fusion of the sacroiliac joints, possibly indicative of inflammatory bowel disease or ankylosing spondylosis.[23] (Tr. 244-45). It was Dr. Castro's impression that plaintiff has spondyloarthropathy with peripheral joint

---

[20]Enteropathic arthropathy refers to arthritis due to various GI infections. Enteropathic arthropathy affects abouth 20% of those with inflammatory bowel disorder. See http://www.clinicalreview.com/Members/Wikiindex.php?title Enteropathic_Arthropathy (last visited on June 28, 2011).

[21]Tramadol is prescribed for treatment of moderate to moderately severe pain. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Nov. 6, 2009).

[22]Methotrexate is used to treat severe psoriasis that cannot be controlled by other treatments. It is also prescribed to treat severe active rheumatoid arthritis and certain types of cancers. http://www.nlm.nih.gov/medlineplus/druginfo/meds/ a682019.html (last visited June 28, 2010).

[23]A systemic disorder characterized by inflammation of the axial skeleton and large peripheral joints. Stedman's Med. Dict. 290 (27th ed. 2000).

manifestations.  Plaintiff was told that he needed a gastrointestinal evaluation to rule

out inflammatory bowel disease, but plaintiff was "reluctant to do it."  (Tr. 220).

## IV.  The ALJ's Decision

In the decision issued on August 26, 2008, the ALJ made the following findings:

1.    Plaintiff met the insured status requirements of the Social Security Act through June 30, 2009.

2.    Plaintiff had not engaged in substantial gainful activity since June 8, 2005, the alleged onset date.

3.    Plaintiff has the following severe impairment: inflammatory arthritis.

4.    Plaintiff does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5.    Plaintiff has the residual functional capacity to perform light work, where he can lift as much as 20 pounds occasionally and 10 pounds frequently; he can sit, stand, or walk, off and on, for up to 6 hours in a workday, with the ability to alternate his position at will with a sit/stand option; where he would only occasionally need to climb stairs or ramps, stoop, kneel, or crawl; where he would not need to climb ropes, ladders, or scaffolds; and where he would not have concentrated exposure to extreme cold, vibration or unprotected workplace hazards.

6.    Plaintiff is unable to perform his past relevant work.

7.    Plaintiff was 35 years old, a younger individual, on the alleged date of onset.

8.    Plaintiff has at least a high school education and is able to communicate in English.

9.    Transferability of job skills is not material to the determination of disability using the Medical-Vocational Guidelines.  See 20 C.F.R. Part 404, Subpart P, App. 2.

10.   Considering the plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can do.

11.   Plaintiff was not under a disability, as defined in the Social Security Act, from June 8, 2005, through the date of the decision.

## V. Discussion

To be eligible for disability insurance benefits, plaintiff must prove that he is disabled. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382 (a)(3)(A) (2000). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner employs a five-step evaluation process, "under which the ALJ must make specific findings." Nimick v. Secretary of Health and Human Serv. 887 F.2d 864 (8th Cir. 1989). The ALJ first determines whether the claimant is engaged in substantial gainful activity. If the claimant is so engaged, he is not disabled. Second, the ALJ determines whether the claimant has a "severe impairment," meaning one which significantly limits his ability to do basic work activities. If the claimant's impairment is not severe, he is not disabled. Third, the ALJ determines whether the claimant's impairment meets or is equal to one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the claimant's impairment is, or equals, one of the listed impairments, he is disabled under the Act. Fourth, the ALJ determines whether the claimant can perform his past

relevant work.  If the claimant can, he is not disabled.  Fifth, if the claimant cannot perform his past relevant work, the ALJ determines whether he is capable of performing any other work in the national economy.  If the claimant is not, he is disabled.  See 20 C.F.R. §§ 404.1520, 416.920 (2002); Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987).

### A.    Standard of Review

The Court must affirm the Commissioner's decision, "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled."  Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion."  Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002), (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  The Court may not reverse merely because the evidence could support a contrary outcome.  Estes, 275 F.3d at 724.

In determining whether the Commissioner's decision is supported by substantial evidence, the Court reviews the entire administrative record, considering:

1.    The ALJ's credibility findings;

2.    the plaintiff's vocational factors;

3.    the medical evidence;

4.    the plaintiff's subjective complaints relating to both exertional and nonexertional impairments;

5.    third-party corroboration of the plaintiff's impairments; and

6.    when required, vocational expert testimony based on proper hypothetical questions, setting forth the claimant's impairment.

See Stewart v. Secretary of Health & Human Servs., 957 F.2d 581, 585-86 (8th Cir. 1992).

The Court must consider any evidence that detracts from the Commissioner's decision.  Warburton v. Apfel, 188 F.3d 1047, 1050 (8th Cir. 1999).  Where the Commissioner's findings represent one of two inconsistent conclusions that may reasonably be drawn from the evidence, however, those findings are supported by substantial evidence.  Pearsall, 274 F.3d at 1217, (citing Young v. Apfel, 221 F.3d 1065, 1068 (8th Cir. 2000)).

### B.  Analysis

Plaintiff contends that the ALJ did not properly consider his inability to pay for treatment when evaluating his subjective complaints of pain and did not give proper weight to Dr. Carmignani's opinion.  He also argues that the Appeals Council failed to consider evidence submitted after the ALJ's decision.

### 1.  Plaintiff's Inability to Pay for Treatment

The ALJ determined that plaintiff's subjective complaints of disabling pain were not fully credible, stating that plaintiff reported symptoms that "suggest the possibility of a greater restriction on his functional abilities than is demonstrated by the objective medical evidence" and that "other information" needed to be considered.  (Tr. 17). Included in the "other information" the ALJ considered was plaintiff's refusal to obtain x-rays or see a specialist because of the cost.  Plaintiff states that the ALJ improperly analyzed his lack of treatment under Social Security Ruling 96-7p and, thus, the ALJ's assessment of plaintiff's credibility was improper.

Plaintiff argues that the ALJ misapplied Social Security Ruling 96-7p, which provides:

> Persistent attempts by the individual to obtain relief of pain . . . may be a strong indication that the symptoms are a source of distress . . . and generally lend support to an individual's allegations of intense and persistent symptoms.  On the other hand, the individual's statements may be less credible if the level or frequency of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this failure.

Id. at *7.

The ALJ may not draw inferences from the failure to pursue treatment without first considering the claimant's explanation for the failure, such as an inability to afford treatment and lack of access to free or low-cost medical services.  Id. at *8.  "If a claimant truly has no access to health care, then the absence of such care would not tend to disprove [his] subjective complaints of pain."  Harris v. Barnhart, 356 F.3d 926, 930 (8th Cir. 2004).

Despite a diagnosis of rheumatoid arthritis, plaintiff went without treatment for ten years, and without diagnostic scans for nearly twenty years.  He had not received proper medications in that time, relying instead on over-the-counter medications.  Dr. Carmignani urged plaintiff to see a specialist for proper assessment and treatment, but he demurred, stating that he preferred to wait for treatment until he had insurance coverage.  Dr. Carmignani told him that low-cost treatment might be available through a university clinic, but he declined to pursue that option.  (Tr. 178, 179, 180, 181).  In evaluating the credibility of a claimant's subjective complaints, it is permissible for the ALJ to consider the lack of evidence that the claimant sought out treatment available to indigents.  Harris, 356 F.3d at 930.

Plaintiff sought treatment at a rheumatology clinic after the ALJ denied his applications for benefits.  The records of his care at the clinic were submitted to the Appeals Council.  This evidence does not alter the analysis with respect to plaintiff's

disinclination to follow treatment recommendations, since he refused to pursue the gastrointestinal evaluation necessary for obtaining a proper diagnosis of an allegedly disabling condition.

Plaintiff also challenges the ALJ's reference to the fact that he had retained private counsel to represent him in connection with pending criminal charges. (Tr. 18-19). There was no evidence in the record before the ALJ regarding who paid for plaintiff's representation. Plaintiff argues that it was improper for the ALJ to consider this evidence in discounting plaintiff's credibility.

It is erroneous for the ALJ to rely on items outside the record. Albalos v. Sullivan, 907 F.2d 871, 874 (9th Cir. 1990). The error is harmless in this case, however, because substantial evidence in the record supports the ALJ's decision that plaintiff is not disabled. See Hyde v. Barnhart, 132 Fed. Appx. 161, 163 (9th Cir. 2005) (any consideration of extra-record evidence was "incidental" to determination); Nelson v. Apfel, 131 F.3d 1228, 1236-47 (7th Cir. 1997) (ALJ's consideration of claimant's behavior outside hearing harmless error); Strout v. Astrue, 2009 WL 214576, at *7 (D. Maine, Jan. 28, 2009) (harmless error where ALJ noted that he had seen plaintiff "throw" his wheelchair into his vehicle).

In completing his credibility analysis in this case, the ALJ properly noted that the medical records did not reflect objective findings consistent with plaintiff's allegations of disabling pain. (Tr. 18). He also noted that plaintiff's last job terminated because he was laid off, not because of disabling symptoms.[24] There was no evidence in the record that plaintiff's physical condition had deteriorated in the interval and thus there

---

[24]At his initial visit to Dr. Carmignani, plaintiff identified being laid off as a reason for his heightened anxiety.

was no reason to believe that he would have been unable to continue in that job absent the layoff. (Tr. 19). Plaintiff told Dr. Carmignani that anxiety was a barrier to work, but the treatment notes established that this condition was well-controlled by medication. None of plaintiff's treating physicians opined that he was incapable of sedentary work so long as he had a sit/stand option.

Based on the foregoing, the Court cannot say that the ALJ's credibility determination was unsupported by the record as a whole.

### 2.    The ALJ's Attempt to Obtain Dr. Carmignani's Opinion

The ALJ noted in his decision that he had attempted to contact Dr. Carmignani regarding her "opinions and the conflicts with the record" but had not received a response. (Tr. 19). Plaintiff argues that the ALJ erred in relying on evidence outside the record (*i.e.*, Dr. Carmignani's nonresponse). He states that, with proper notice, counsel would have assisted the ALJ in obtaining answers to his questions. Indeed, after receiving the ALJ's decision, counsel for plaintiff obtained new interrogatory responses from Dr. Carmignani in an attempt to clarify the objective support for her opinion. At that time, she indicated that plaintiff was limited to "sedentary type" work and thus, by implication, she did not find him disabled. (Tr. 134). Presumably, she would have given the same assessment if she had been contacted before the ALJ issued his decision. Any error the ALJ committed by relying on Dr. Carmignani's "nonresponse" was harmless, in that her subsequent clarification indicates that plaintiff is not disabled.

### 3.    New Evidence Before the Appeals Council

Plaintiff obtained treatment from the University of Missouri Rheumatology Clinic after the ALJ issued his decision. Records of that treatment were submitted to the

-21-

Appeals Council. The Appeals Council stated that it considered the additional evidence and determined that it did not provide a basis for changing the ALJ's decision. (Tr. 1-2). Plaintiff asserts that it does not appear that the Appeals Council "truly considered this new evidence as there was no analysis" of the new material.

The regulations provide that the Appeals Council must evaluate the entire record, including any new and material evidence that relates to the period before the date of the ALJ's decision. 20 C.F.R. § 404.970(b); Cunningham v. Apfel, 222 F.3d 496, 500 (8th Cir. 2000). The newly submitted evidence becomes part of the administrative record, even though the evidence was not originally included in the ALJ's record. Id. This Court does not review the Appeals Council's denial but determines whether the record as a whole, including the new evidence, supports the ALJ's determination. Id.

The newly submitted evidence consists of the updated interrogatory responses from Dr. Carmignani and treatment records from the University of Missouri Rheumatology Clinic. As noted above, Dr. Carmignani opined that plaintiff was capable of sedentary work. With respect to the notes from the Rheumatology Clinic, Dr. Castro found no evidence of rheumatoid arthritis, Dr. Siva doubted that plaintiff had an inflammatory process, and plaintiff rejected the recommendations for further treatment. These additional records support the ALJ's determination that plaintiff is not disabled.

## VI. Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole. Therefore, plaintiff is not entitled to relief.

Accordingly,

**IT IS HEREBY ORDERED** that the relief sought by plaintiff in his brief in support of complaint [Doc. #14] is **denied**.

A separate Judgment in accordance with this order will be entered this same date.

CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 5th day of July, 2011.